IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THE MATTER OF THE SEARCH OF: | * | |
| | * | |
| INFORMATION ASSOCIATED | * | GLS-20-2614 |
| WITH A WHITE APPLE IPHONE | * | CASE NO. ~~GLS-20-2177~~ |
| WITH SIM CARD NUMBER: | * | |
| 8901260235709986366 AT PREMISES | * | |
| CONTROLLED BY THE UNITED | * | FILED UNDER SEAL |
| STATES PARK SERVICE IN | * | |
| MARYLAND | * | |
| | * | |

********

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A SEARCH WARRANT

I, Gary Hatch, being duly sworn, do hereby depose and state:

#### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B

2. I am an Officer with the United States Park Police ("USPP"). I am currently assigned to District Four, Greenbelt Park Station. My responsibilities include enforcement of laws and investigation of offenses committed within the National Park Service system. As a federal agent, I am authorized to investigate violations of laws of the United States and I am a law enforcement officer with the authority to execute arrest and search warrants issued under the authority of the United States.

3. The statements in this affidavit are based in part on information provided by other law enforcement officers, as well as documents and reports prepared by others, and on my experience and background as a USPP Officer. Since this affidavit is being submitted for the

limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

4.    I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrants and not all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.    The property to be searched is: a white Apple iPhone with SIM card number: 8901260235709986366 (hereinafter "**TARGET DEVICE**"), which is described herein and in Attachment A.

6.    The applied-for warrant would authorize the forensic examination of the **TARGET DEVICE** for the purpose of identifying electronically stored data particularly described in Attachment B.

7.    The **TARGET DEVICE** is currently in law enforcement possession at the USPP Greenbelt Park Station evidence control room in Greenbelt, Prince George's County, Maryland. In my training and experience, I know that the **TARGET DEVICE** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICE** first came into the possession of law enforcement.

## PROBABLE CAUSE

8.    Based on the facts set forth in this affidavit, there is probable cause to believe that, on June 27, 2020, Jamal DAVIS (hereinafter "DAVIS") caused damage to government property, was disorderly, and interfered with government operations, and that DAVIS recorded this conduct with the **TARGET DEVICE**. Therefore, there is probable cause to believe that the **TARGET DEVICE** contains evidence of violations of 18 U.S.C. § 1361 (Damaging Government Property), 36 C.F.R. § 2.34 (Disorderly Conduct), 36 C.F.R. § 2.32 (Interfering with Agency Functions), and

36 C.F.R. § 4.23 (Driving Under the Influence of Alcohol) (collectively the "**TARGET OFFENSES**") as described in Attachment B.

**June 27, 2020 Traffic Stop and Arrest**

9. On June 27, 2020, I was dispatched for the report of a possible intoxicated driver that had been stopped by National Security Agency (NSA) Police on the northbound Baltimore Washington Parkway, south of Maryland Route 175. The Baltimore Washington Parkway is located on lands administered by the National Park Service.

10. When I arrived, an NSA sergeant told me that he had encountered a black Dodge Charger bearing Maryland temporary tag B46841 stopped in the roadway in the right lane of travel. The NSA officer activated his lights and directed the Dodge Charger to move to the right shoulder. He observed that the driver appeared to be under the influence of drugs or alcohol, and was agitated.

11. I approached the vehicle and contacted the driver, later identified as JAMAL DAVIS ("DAVIS"). I detected the odor of alcoholic beverage emanating from the vehicle, and noticed that DAVIS's eyes were red, bloodshot, and watery. While speaking, DAVIS's words were slurred, and he appeared confused by simple questions. I administered standardized field sobriety testing, determined that DAVIS was intoxicated, and placed him under arrest for driving under the influence of alcohol.

12. During the field testing, DAVIS became agitated, started talking over me while I gave instructions, and tried to talk to other officers on the scene. As I walked DAVIS to the back of my police cruiser, DAVIS became more agitated and yelled "I'm gonna have your job, this is what you do to a black man. I haven't done anything wrong, you stopped me for no reason."

3

13. When we arrived at the Greenbelt Park Police station, which is located on lands within the special maritime and territorial jurisdiction of the United States, administered by the National Park Service, another U.S. Park police officer helped me escort DAVIS to the rear door of the station. During this walk, DAVIS attempted to "buck" at me as if he intended to head-butt me, but no contact was made and I simply pushed him away.

14. During processing, DAVIS continued to shout and insult all the officers in the room, using racial slurs and attempting to provoke the officers into doing something to him. At one point DAVIS stated "I got you Hatch, Imma get your address and come get you." Another officer attempted to advise DAVIS of the alcohol testing protocols, but DAVIS would not listen and talked over the other officer the entire time. When asked if he would submit to a blood draw (no breath tests are available due to COVID-19), DAVIS stated he would not consent to anything.

15. The officers completed processing and DAVIS was issued citations for stopping in the roadway, driving under the influence of alcohol, refusal to take chemical testing and interfering with agency function. DAVIS was released from custody to the front lobby.

16. After DAVIS was released and informed that his vehicle would remain impounded for 24 hours, DAVIS became irate and started screaming and swearing, and kicking and punching the front door of the station in an attempt to get back into the hallway. DAVIS continued this behavior for over ten minutes. In addition to the kicking, punching, and screaming, he also banged on the station's front window and then he turned around and started "donkey kicking" the wooden door into the hallway.

17. DAVIS's brother, who had been called to pick him up, was present for and observed DAVIS' actions. DAVIS's brother stated that he did not want to intervene because DAVIS had punched their sister so hard in the face that it had broken her eye socket, and he did not want the

same thing to happen to him. DAVIS continued this behavior until he moved outside to his brother's vehicle. He refused to get into his brother's car, however, and again attempted to gain entry into the station. At this point, U.S. Park Police Officer Derossa arrived at the station for the day shift. Officer Derossa, who was a former marine, as was DAVIS, attempted to calm DAVIS down and persuade him to leave with his brother. Officer Derossa was not successful. DAVIS's brother left, leaving DAVIS without a ride home.

18. DAVIS became angry that he didn't have a ride, so Park Police officers again attempted to calm him, to no avail. DAVIS began to follow officers as they attempted to go back inside the station. Officers stopped DAVIS multiple times, telling him not to follow them, but he continued to do it anyway. DAVIS followed officers all the way to the front door of the station and officers had to physically stop him from entering so they could shut the door.

19. Approximately ten minutes later, another officer walked out to the front parking lot and attempted to get into her personal vehicle to leave for the day. DAVIS saw her and immediately walked toward her, yelling that he wanted her name. I stopped DAVIS and told him multiple times again that he was free to go and that the officers wanted him to leave. DAVIS continued to attempt to push past me, trying to reach the other officer. I continued to move DAVIS away and toward the front entrance of the parking lot. The other officer started to move her personal vehicle toward the entrance and DAVIS tried to push past me, to photograph her vehicle's tag number, stating "I'm gonna put your tag on Instagram." At that point, DAVIS was again arrested and taken back into the District Four station for processing. DAVIS was charged with damaging government property, disorderly conduct, and interfering with government operations. The day shift officers that had recently arrived processed DAVIS for the second arrest.

20. During the entire incident, DAVIS' iPhone was in his hand, and he repeatedly claimed to be recording everything. Specifically, DAVIS indicated that he was recording during the events set forth herein in paragraphs 16 through 19. His iPhone was seized incident to his arrest, as evidence, because the recording he made is evidence of his conduct. The iPhone is being kept at the U.S. Park Police station in Greenbelt, Maryland.

21. Based on my training, experience, and research, I know that the item to be searched, further described in Attachment A, has capabilities that allow it to serve the above-described function or store information relevant to that function.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods. This information can sometimes be recovered with forensics tools

23. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET DEVICE** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **TARGET DEVICE** because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media,

        and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e) the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET DEVICE** described in Attachment A to seek the items described in Attachment B.

*[signed] 8/24/20*
Officer Gary Hatch
United States Park Police

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P 4.1 and 41(d)(3) this  25th  Day of August 2020.

*[signed]*

HONORABLE GINA L. SIMMS
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
### Location to Be Searched

The property to be searched is a white Apple iPhone with SIM card number: 8901260235709986366. The property is currently located in law enforcement possession at the United States Park Police ("USPP") evidence control room in Greenbelt, Prince George's County, Maryland.





1







3

## ATTACHMENT B
## List of Items Authorized to be Searched and Seized

1. All records contained in the item described in Attachment A which constitute evidence of violations of 18 U.S.C. § 1361 (Damaging Government Property), 36 C.F.R. § 2.34 (Disorderly Conduct), 36 C.F.R. § 2.32 (Interfering with Agency Functions), and 36 C.F.R. § 4.23 (Driving Under the Influence of Alcohol), and involving JAMAL DAVIS, including information pertaining to the following matters:

    a. Photographs, audio clips and video clips related to the June 27, 2020 violations that occurred between 4:00 a.m. and 8:00 a.m.

    b. Evidence of user attribution.

2. With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

    a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

    b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

    c. "scanning" storage areas to discover and possible recover recently deleted files;

    d. "scanning" storage areas for deliberately hidden files; or

    e. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

3. If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

4. With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored

information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.